## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Randolph Pentel, Kim Povolny, Michelle Povolny, and Michael Povolny, On Behalf of Themselves and All Others Similarly Situated, | **Case No. _____** |
| Plaintiffs | |
| v. | **COMPLAINT (CLASS ACTION)** |
| Michael Shepard, in his individual capacity as an employee of the City of Mendota Heights and City of Mendota Heights, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Randolph Pentel, Kim Povolny, Michelle Povolny, and Michael Povolny, individually and on behalf of all others similarly situated, for their Class Action Complaint ("Complaint") against the above-named defendants, hereby state and allege as follows:

### <u>General Background of Law and Facts</u>

1.      This is an action for injunctive relief and monetary damages for injuries sustained when Defendants Michael Shepard ("Shepard") and City of Mendota Heights ("Mendota Heights") illegally obtained, disclosed, and/or used Plaintiffs' and Class Members' private, personal and confidential drivers' license information without a legitimate or permissible law-enforcement purpose or any other lawful purpose, in

violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* ("DPPA"), and for the same and additional reasons as set forth herein, disclosed and invaded private data in violation of the Minnesota Government Data Practices Act ("MGDPA"), Minn. Stat. §§ 13.01, *et seq.*

2.      Mendota Heights employed Shepard as an officer in the Mendota Heights Police Department.  As part of his duties, Mendota Heights authorized Shepard to have access to the Minnesota Department of Public Safety's ("DPS") Driver and Vehicle Services Database ("DVS Database"), Bureau of Criminal Apprehension license plate database ("BCA Database"), and MyBCA Database ("MyBCA") (collectively, "State Databases"), all of which included license plate information and other private drivers' license information regarding Minnesota drivers.

3.      In 2016, Shepard accessed his former co-workers, a love interest, the city administrator, city council members, a female firefighter, a local police chief and his wife who live in Mendota Heights, and others, for non-business reasons.

4.      Mendota Heights suspended Shepard without pay on the grounds that he misused the State Databases, including obtaining the private information of at least 12 people for non-business reasons over fewer than five months during 2016.  Plaintiffs and Class Members were harmed by Shepard's unlawful obtainment, use, and/or disclosure of their private information and seek relief from this Court.

5.      Shepard illegally obtained, disclosed, and/or used the personal information of numerous persons in a manner that shows pervasive use as well as widespread knowledge of his illegal use.

6.     Additionally, he knew that the MGDPA prohibits conduct in violation of the DPPA as well as independently prohibiting the access and disclosure of private data as that term is defined under the MGDPA, and renders the responsible authority, as defined under the MGDPA, liable.

7.     Mendota Heights is the responsible authority for any prohibited access or disclosure of private data by Shephard.

8.     Finally, Mendota Heights was required by law, including Minn. Stat. § 13.055, to notify Plaintiffs and Class Members of these violations as they were the subjects of the data that was improperly acquired by Shepard.

9.     Mendota Heights failed to notify Plaintiffs and Class Members about Shephard improperly acquiring their private information.

10.     Failure by Mendota Heights to notify Plaintiffs and Class Members about Shephard's improper acquisition of their private information is itself another violation of the MGDPA.

11.     Congress enacted the DPPA in 1994 to prevent impermissible access, use, and disclosure of individuals' drivers' license information.

12.     Congress restricted access, use and disclosure of drivers' license information for only permissible purposes set forth in the statute.

## JURISDICTION

13.     This Court has subject matter jurisdiction over Count I pursuant to the DPPA, 18 U.S.C. § 2721, *et seq*.  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

3

14.     In addition, this Court has pendent or supplemental jurisdiction over Count II related to the MGDPA pursuant to 18 U.S.C. § 1367.

15.     The DPPA claim in Count I is a federal claim arising under the above federal statute so that this Court is exercising federal question jurisdiction; the MGDPA claim in Count II arises from the same set of operative facts as Count I such that Plaintiffs would expect to try all claims in one proceeding, and doing so is in the interests of justice and judicial economy.

16.     The amount in controversy exceeds $75,000, excluding interest and costs.

## PARTIES

17.     Plaintiff Randolph Pentel ("Pentel") is, and was at all times material, a resident of the State of Minnesota and a citizen of the United States.

18.     Plaintiff Michelle Povolny is, and was at all times material, a resident of the State of Minnesota and a citizen of the United States.

19.     Plaintiff Michael Povolny is, and was at all times material, a resident of the State of Minnesota and a citizen of the United States.

20.     Plaintiff Kim Povolny is, and was at all times material, a resident of the State of Minnesota and a citizen of the United States.

21.     Defendant Michael Shepard ("Shepard") is, and was at all times material, a resident of the State of Minnesota, a citizen of the United States, and an employee of the City of Mendota Heights.

22.     Defendant City of Mendota Heights is a city in Minnesota, which can be sued under Minn. Stat. § 466.01, *et seq.*

4

## COMMON FACTUAL ALLEGATIONS

### The DVS and BCA Databases

23.     The Driver and Vehicle Services Division of the DPS maintained motor vehicle records regarding each of the named Plaintiffs and the Class Members.

24.     The DVS Database contains "personal information" and "highly restricted personal information," as defined by 18 U.S.C. § 2725 ("Private Data"), including but not limited to names, dates of birth, driver's license numbers, addresses, driver's license photos, weights, heights, various health and disability information, and eye colors of Minnesota drivers, both current and former information dating back to the driver's first license issued in Minnesota.

25.     The DVS Database may be accessed and queried by entering a person's name, license plate number, or driver's license number.

26.     The BCA Database may be accessed and queried by different means, including by entering a person's name, license plate number, or driver's license number.

27.     The DVS Database and the BCA Database contain Private Data.

### Widespread Misuse of Private Data By Law Enforcement

28.     In 2013, the Minnesota Legislative Auditor issued a report describing widespread misuse of the DVS Database by law enforcement in Minnesota.  (Legislative Auditor's Report attached to this Complaint as Exhibit A).

29.     In 2014, DVS terminated access of licensed law enforcement officers to the DVS Database.

30.     When access to the DVS Database changed for Minnesota's licensed law enforcement officers, DVS provided access of motor vehicle records to licensed law enforcement officers through a newly-created "MyBCA" portal.

31.     Private Data is accessible through MyBCA and the related BCA Database.

32.     Since 2014, DVS required law-enforcement personnel to obtain Private Data about Minnesota drivers through the MyBCA Database, although other individuals and entities who were previously permitted access to drivers' license data by DPS were still permitted to use the DVS Database.

33.     Plaintiffs and the Class Members all provided Private Data to DPS, including their addresses, color photographs, dates of birth, weights, heights, medical information, donor status, Social Security numbers, and eye colors for the purposes of acquiring and utilizing a Minnesota State driver's license.

34.     The Private Data of Plaintiffs and Class Members is protected from impermissible access, use, and disclosure by the DPPA and the MGDPA.

**Mendota Heights and Officer Shepard's Misuse of Private Data**

35.     Mendota Heights employed Shepard as a Police Officer from 2006-2017.

36.     Mendota Heights authorized Shepard to have access to the DPS and BCA Databases, each of which contained the private drivers' license information of every Minnesota driver and from non-licensed drivers who had a Minnesota state ID card.

37.     Mendota Heights did not permit all of its employees to use these databases, only certain employees.

6

38.     Mendota Heights warned Shepard that inappropriate use of drivers' data would result in disciplinary action.

39.     Specifically, in 2009, DPS ran an audit of Shepard's DVS Database obtainments, and notified the then-Chief of Police of Mendota Heights, Mike Aschenbrener, that Shepard had misused the DVS Database to obtain the Private Data of at least two individuals – the alleged perpetrator and the victim of a murder.

40.     On December 10, 2009, then-Chief Aschenbrener coached Shepard about appropriate use of the DVS Database.

41.     Upon information and belief, Shepard was disciplined by Mendota Heights at least five times since 2010.

42.     In January 2010, Shepard received a written reprimand for insubordination.

43.     In September 2010, Shepard received a written reprimand for driving at excessive speeds and reflecting a poor image of the department.

44.     In 2011, Shepard received a four-day suspension for violating the Mendota Heights harassment and discrimination policy related to his mistreatment of a female co-worker.

45.     In August 2011, Mendota Heights suspended Shepard one day for insubordination.

46.     In 2016 and 2017, Mendota Heights conducted an internal affairs investigation of Shepard's use of Private Data ("Investigation").

47.     The Investigation concluded that between June 1, 2016 through October 11, 2016, Shepard engaged in the unauthorized obtainment and use of Private Data by

7

running the license plates of at least 12 individuals, including former co-workers, a love

interest, Mendota Heights City Council Members, City officials with authority to

promote law-enforcement personnel, Mendota Heights City Administrator Mark McNeill,

a female Mendota Heights firefighter, and a local police chief from another city and that

police chief's wife.  (Investigation attached to this Complaint as Exhibit B).

48.     According to the Investigation, Shepard also accessed the DVS photograph

of a female acquaintance who reported a theft.

49.     According to the Investigation, Shepard ran these 12 individuals' Private

Data for non-business reasons.

50.     According to the Investigation, Shepard's obtainments could impact the

victims' personal safety.

51.     Shepard gave a statement as part of Mendota Heights' Investigation

regarding his inappropriate obtainments.  Shepard was unable to provide a business

reason for going to the home of a chief of police from another city who lived in Mendota

Heights, running the plate of one of the people he knew lived there, and returning to the

same home the next day to run the plate of the other adult who lived there.

52.     The Investigation concluded that no reasonable officer would think it was

appropriate to use the State Databases to access Private Data for non-business reasons.

The report stated:  "Prior to 2010, the impact of improper accesses was not fully

understood throughout the law enforcement community.  Several high profile cases

changed how access was monitored and how officers were trained.  I believe there is no

reasonable officer in 2016 who doesn't understand that inappropriate access of the DVS system is a major infraction."

53.     According to Mendota Heights' own investigation, Shepard is the only Mendota Heights Police Department employee to have confirmed misuse of DPS data (in 2009), yet Mendota Heights failed to take the necessary steps to prevent his later misuse of Private Data.

54.     Despite numerous disciplinary actions, Mendota Heights never terminated Shepard.

55.     On February 17, 2017, after this five-month internal affairs Investigation, Shepard was suspended for 30 days without pay, consisting of 15 days for misusing state driver and vehicle data and 15 days for insubordination after discussing the investigation with the mayor-elect of Mendota Heights.

56.     On August 29, 2017, Mendota Heights put Shepard on paid administrative leave while it investigated yet another complaint against him.

57.     Shepard resigned his employment in November 2017.

58.     After Shepard resigned, Mendota Heights terminated the August 2017 Investigation of him.

59.     Under the DPPA, when Shepard made these unauthorized obtainments, Mendota Heights, which is itself a "person" under the DPPA, also made these unauthorized obtainments.

60.     Mendota Heights has lax policies and/or lax enforcement of these policies that allow for these intrusions.

61.     Mendota Heights has an inadequate practice of ascertaining and controlling the illegal access to individuals' private information by its employees.

62.     Access to the Private Data was made by providing a user account and a password without reasonably requiring or ensuring that accesses would be limited to those for a legitimate purpose.

63.     This form of disclosure was and is used not only for law-enforcement personnel but other recipients who have access to the DVS Database, including non-government employees, who comprise about half of the persons who have been granted access to the DVS Database.

64.     Disclosures were made to law-enforcement personnel, including Shepard, based simply upon the recipients' status.

65.     Mendota Heights failed to reasonably ascertain or ensure that Shepard would use the State Databases permissibly.

66.     Mendota Heights did not inquire from Shepard the purpose for which Plaintiffs' and Class Members' information was needed.

67.     Mendota Heights failed to ascertain or ensure specifically that Shepard would use it permissibly, that is, for a law-enforcement function.

68.     Mendota Heights failed to provide reasonably adequate training in the permissible uses of the State Databases.

69.     To the extent Mendota Heights delegated any part of its duties, it is still responsible for Shepard's obtainments and use of the State Databases.

70.     Mendota Heights failed to monitor Shepard's activities on the State Databases, which it could have easily done by asking for audits from DPS.

71.     Defendants' conduct creates an increased risk of identity theft for Plaintiffs and Class Members.

72.     Many viable methods were and are available to prevent the illegal obtainment of private information.

73.     At all relevant times Mendota Heights had the ability to determine that drivers' license information was being accessed by Shepard.

74.     Mendota Heights had the ability to prevent unauthorized access to the State Databases, including unauthorized access to Plaintiffs' and Class Members' Private Data.

75.     Mendota Heights failed to prevent unauthorized access to the State Databases, including access to Plaintiffs' and Class Members' Private Data.

76.     The policy of Mendota Heights is to uphold the provisions of the law, both state and federal, and to protect and safeguard the privacy rights of the State's citizens and inhabitants, including its drivers' privacy rights, and including those rights as are required to be protected by federal law.

77.     Upon information and belief, it is the policy of Mendota Heights, as outlined in Minn. Stat. § 171.12, subd. 7, to comply with the provisions and requirements of the DPPA.

78.     Mendota Heights and Shepard both failed to follow Mendota Heights' policies.

79.     Mendota Heights' failure exposed Plaintiffs' and Class Members' information to impermissible and knowing accesses by Shepard.

80.     Mendota Heights knows that accesses to at least some of the State Databases could be made from personal computers.

81.     Mendota Heights knew that Shepard was accessing the State Databases for impermissible purposes.

82.     Upon information and belief, Mendota Heights actually knew that Shepard was viewing Plaintiffs' and Class Members' Private Data without a legitimate and permissible purpose.

83.     Upon information and belief, Mendota Heights acquiesced, facilitated, approved, or simply ignored the improper conduct by Shepard.

84.     Shepard's and Mendota Heights' conduct in obtaining, disclosing, or using the Private Data for purposes not permitted under the DPPA was in willful and reckless disregard of federal law.

85.     Defendants Shepard's and Mendota Heights' obtainment and use of Plaintiffs' and Class Members' personal information was not for any use in carrying out any law-enforcement, governmental, judicial, or litigation-related function.

86.     Shepard's obtainment and use of Plaintiffs' and Class Members' personal information was for purposes that were purely personal to Defendant Shepard.

87.     Shepard's purposes in obtaining Plaintiffs' and Class Members' information were personal and even malicious in nature.

12

88.     Shepard had no legitimate law-enforcement reason to obtain, disclose, or use Plaintiffs' and Class Members' personal information.

89.     Shepard was able to access the aforementioned Private Data by virtue of his agency relationship with Mendota Heights, and that relationship aided him in doing so.

90.     Shepard used Mendota Heights' computers and accessed the State Databases with passwords and credentials that were available to him because he was a law-enforcement officer for Mendota Heights.

91.     Mendota Heights extended authority to Shepard to use the State Databases and to access Plaintiffs' and Class Members' Private Data.

92.     Shepard had apparent authority from Mendota Heights to use the State Databases, unlike other Mendota Heights employees who were not provided access.

93.     The information in the State Databases was provided to Shepard and other Mendota Heights law-enforcement personnel for carrying out law-enforcement functions.

94.     Mendota Heights provided State Database credentials for Shepard's use in his role as a law-enforcement officer within the course and scope of his employment and Shepard used those databases within the course and scope of his employment.

95.     Each of the obtainments was committed knowingly; each of the obtainments was impermissible because Shepard had no law-enforcement reason for accessing the information.

96.     Shepard obtained the information for personal reasons instead of law-enforcement reasons.

97.     Shepard viewed Plaintiffs' and Class Members' Private Data from their State-issued drivers' licenses including their home addresses, color photographs or images, dates of birth, eye colors, heights, weights, driver identification numbers, donor status, and medical information.

98.     Shepard made these accesses using Plaintiffs' and Class Members' names, drivers' license numbers, or license plates.

99.     After Shepard looked up Plaintiffs' and Class Members' Private Data, he gained knowledge of the contents of the Private Data.  In gaining such knowledge, Shepard obtained Plaintiffs' Private Data.

100.    Shepard knew that his obtaining of Private Data was unauthorized.

101.    Shepard obtained the Private Data of Plaintiffs and Class Members for personal reasons, none of which reasons are permitted under the DPPA.

102.    Without legitimate, permissible reasons, Shepard obtained Plaintiffs' and Class Members' Private Data from the State Databases.

103.    Upon information and belief, Shepard further impermissibly used or disclosed Plaintiffs' Private Data.

104.    These obtainments were committed surreptitiously, and without the knowledge of the victims (including Plaintiffs and Class Members) when they occurred; the obtainments were kept hidden and concealed from the victims, including Plaintiffs and Class Members.

105.    Shepard has never informed Plaintiffs or Class Members that he accessed their information.

106.    Shepard went to great lengths to avoid letting Plaintiffs and Class Members know he had accessed their personal private information.

107.    The surreptitious, concealed, and hidden accesses are kept secret from the general public and from the victims, including Plaintiffs and Class Members.

108.    Plaintiffs and Class Members bring this action for any illegal obtainments, disclosure, or use of Private Data by Defendants in the four years preceding the commencement of this lawsuit.

109.    Whatever training, monitoring, or inquiry into the officers' usage of the information systems has been adopted is woefully inadequate to ensure that the databases are used properly and lawfully.

110.    Despite any training undergone by Shepard, Mendota Heights allowed him to obtain Plaintiffs' and Class Members' Private Data for unlawful purposes.

111.    Upon information and belief, Mendota Heights permitted, condoned, or acquiesced in this illegal access to Plaintiffs' and Class Members' private information, and knew or should have known that it was occurring.

112.    Upon information and belief, these illegal accesses occurred with regularity not only of Plaintiffs' private information, but of other Minnesota drivers' private information.

113.    Mendota Heights either had no viable method or has an inadequate method of ascertaining and controlling the illegal access to individuals' private information by its officers.

114.   The extent of this illegal access has been widespread and pervasive throughout departments, and has been a custom and practice.

115.   The widespread practice is demonstrated by the systemic tolerance of illegal accesses.

116.   Each user with access to the DVS Database has passwords allowing that individual access to that Database.

117.   Mendota Heights personnel can access the DVS Database from any computer with internet access.

118.   Mendota Heights personnel occasionally gave other individuals their passwords, contrary to requirements.

119.   Each individual with access to the BCA Database has a password allowing that individual access to the BCA Database.

120.   Each individual with access to the MyBCA Database has a password allowing that individual access to the MyBCA Database.

121.   When Shepard viewed Plaintiffs' and Class Members' private information, he did not do so to carry out official police functions.

**Plaintiffs and Class Members**

122.   Plaintiff Randolph Pentel was a Sergeant in the Mendota Heights Reserve Unit, acting as a voluntary police officer for the city.  He was in the Reserve Unit from late 2008 or early 2009 to 2017.

123.   At one point, Shepard threatened to pull a gun and shoot Pentel in the head.

124.   Pentel ran for Mayor of Mendota Heights in 2016.

16

125.   Upon information and belief, Shepard obtained Pentel's Private Data.

126.   Shepard had no business reason to obtain Pentel's Private Data.

127.   Pentel considers Shepard a potential threat to his safety.

128.   Plaintiff Michael Povolny is the former Acting Mayor and a former City Council Member for Mendota Heights.

129.   From 2003 to 2010, Michael Povolny was on the Mendota Heights Planning Commission.

130.   From 2010 to 2016, Michael Povolny was on the Mendota Heights City Council.

131.   Michael Povolny was informed by Mendota Heights City Attorney Tom Lehman ("Lehman") that Shepard obtained his Private Data and that of his family members.

132.   Specifically, Shepard obtained the Private Data of Plaintiff Kim Povolny and Plaintiff Michelle Povolny, Michael Povolny's wife and daughter respectively.

133.   Based on previous personal encounters, Michael Povolny believes that Shepard dislikes him.

134.   Shepard had no business-related reason to obtain the Private Data of Michael Povolny, Kim Povolny, Michelle Povolny, or any of their family members.

135.   Upon information and belief, in 2016, Shepard accessed only the Private Data of Mendota Heights City Council members or candidates for the City Council who were running for election.  Upon information and belief, Shepard did not obtain the

Private Information of Mendota Heights City Council members who were not running for office in 2016.

136.    Upon information and belief, Shepard obtained this Private Data for political advantage for his allies in the Mendota Heights city government.

137.    It is unknown, at this time, how many times Shepard obtained, disclosed, or used Plaintiffs' or Class Members' Private Data.

138.    Discovery can determine how many times Shepard did so.

139.    Based on the facts alleged above, each of the Plaintiffs had professional relationships with law-enforcement personnel, including Shepard, in Mendota Heights, or were related to individuals who had such professional relationships.

140.    None of the Plaintiffs have ever been charged with or suspected of committing a crime in Mendota Heights' jurisdiction.

141.    On information and belief, none of the Class Members have ever been charged with or suspected of committing a crime in Mendota Heights' jurisdiction.

142.    Before the time the events alleged in this action occurred, Plaintiffs had never been involved in any civil, criminal, administrative, or arbitral proceeding in or involving any of these Defendants, and there was no legitimate reason for Plaintiffs to have been the subject of any investigation by Defendant Shepard.

143.    At no time did any of Plaintiffs or Class Members provide their express consent for Shepard or Mendota Heights to obtain, disclose, or use their Private Data for any non-authorized purpose.

144.    At no time did Plaintiffs or Class Members behave in a manner that would provide any legal justification for Shepard to invade their privacy.

145.    Plaintiffs and Class Members never waived the protections of the DPPA.

146.    Defendants' actions have violated the DPPA.

147.    The sheer volume of the intrusions into their private lives demonstrates that Shepard and Mendota Heights are unfairly hostile and careless toward Plaintiffs' and Class Members' privacy and safety.

148.    Plaintiffs and Class Members committed no crimes or transgressions that would explain or legitimize the unauthorized access of their Private Data by Defendants. Shepard obtained Plaintiffs' and Class Members' personal information without probable cause or reasonable suspicion to believe that Plaintiffs or Class Members had engaged in any criminal activity or any activity even remotely related to criminal activity.

149.    As a result of these invasions of privacy, Plaintiffs and Class Members have suffered and continue to suffer emotional distress.

150.    Defendants have damaged Plaintiffs' and Class Members' lives by these violations.

151.    Plaintiffs and Class Members are entitled to a determination that their rights have been violated, to an order enjoining further violations, and to monetary damages for these violations of federal law.

## CLASS ACTION ALLEGATIONS

152.    Plaintiffs bring this class action pursuant to Fed. R Civ. P. 23(a),

23(b)(2), and 23(b)(3), seeking both injunctive relief and monetary damages, on behalf of

the following Class:

> All individuals whose personal, confidential, private, and/or highly
> restricted information, as defined by 18 U.S.C. § 2721 *et seq.* or Minn. Stat.
> Chap. 13, was obtained, accessed, viewed, used, collected, or disseminated
> by Defendant Shepard, during his period of employment with Mendota
> Heights, for anything other than a law-enforcement or government related
> purpose or for a purpose other than the administration and management of
> Mendota Heights' business at any time during the four years preceding the
> commencement of this lawsuit.

153.    Plaintiffs are members of the Class they seek to represent.

154.    *Numerosity*.  Upon information and belief, the Class has over 50 members.

It would be impracticable, because of their numbers, to bring all persons in the Class

before the Court as individual plaintiffs through joinder.

155.    The identities of all Class Members are unknown at this time and can only

be ascertained though appropriate investigation and discovery.  The members of the Class

are believed to be readily identifiable from records in possession of the officers/officials

of Mendota Heights and/or properly obtained from DPS, along with other relevant

discovery of the Defendants.

156.    *Commonality*.  There are questions of law and fact common to the Class

such that the common issues may be determined in one trial.  Common questions include,

but are not limited to:

a.  Whether Shepard improperly obtained, disclosed, and/or used Class
    Members' "personal information" and/or "highly restricted personal
    information" from the State Databases while employed by Mendota
    Heights;

b.  Whether Shepard's actions in obtaining, disclosing, and/or using dozens of
    individuals' DVS, BCA, and MyBCA records violated the DPPA;

c.  Whether Shepard's actions in obtaining, disclosing, and/or using dozens of
    individuals' DVS, BCA, and MyBCA records was for purposes not
    permitted under the DPPA;

d.  Whether Mendota Heights is directly liable for the obtainments under the
    DPPA;

e.  Whether Mendota Heights is vicariously liable for the conduct of Shepard;

f.  Whether the Plaintiffs and the Class are entitled to liquidated damages of
    $2,500.00 plus attorneys' fees and costs per DPPA violation pursuant to 18
    U.S.C. § 2724(b)(1);

g.  Whether the Plaintiffs and the Class are entitled to exemplary damages
    against Mendota Heights of between $1,000 and $15,000 for each violation
    of the MGDPA pursuant to Minn. Stat. § 13.08, subd. 1;

h.  Whether Mendota Heights was aware of Shepard's improper conduct, as
    described herein, but failed to take action to stop said conduct or take
    appropriate or effective remedial action;

i.  Whether Plaintiffs and the Class are entitled to punitive damages under 18 U.S.C. § 2724(b)(2);

j.  Whether Plaintiffs and the Class are entitled to reasonable attorneys' fees and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2724(b)(3) and Minn. Stat. § 13.08, subd. 1 and subd. 4;

k.  Whether  Mendota Heights' policies and/or practices could be changed to further deter and/or prevent Mendota Heights' personnel from unauthorized access to Plaintiffs' and Class Members' Private Data; and

l.  Whether  Mendota Heights' auditing policies and/or practices related to its officers' use of State Databases could be changed to deter, prevent, and/or identify more quickly Mendota Heights' personnel's unauthorized access to Plaintiffs' and Class Members' Private Data;

157.  *Typicality*.  The claims of Plaintiffs are typical of the claims of all Class Members because they have all been subjected to the same practices and conduct of Defendants.

158.  All common questions are able to be resolved in one case (as they have in other DPPA class actions in this District), and they arise out of the same common factual occurrences as specifically and/or generally alleged herein.

159.  Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can use common, class-wide evidence to prove the elements of their claims, and to overcome Defendants' defenses.

160.    Plaintiffs and all Class Members sustained damages directly caused by Defendants' wrongful and illegal conduct.  That conduct was similar, likely exactly the same, toward each of the Class Members, and is meant to include all persons whose DPS information was illegally accessed.  The rights of Plaintiffs and of each Class Member were violated in the same manner and by the same conduct.  Common questions of law and fact include the allegations, as more specifically described and detailed, in the present Complaint.

161.    It is further anticipated that Defendants' defenses to the Plaintiffs' allegations contained herein will be typical of their defenses of the Class.

162.    The claims of Plaintiffs arise from the same event(s) or are based on the same legal theory as the claims of the Class Members.

163.    *Adequacy of representation*.  Plaintiffs are adequate representatives of the Class because: (1) they are willing and able to represent the Class and have every incentive to pursue the monetary claims in this action to a successful conclusion; (2) Plaintiffs have an adequate interest in injunctive relief for purposes of certification under Fed. R. Civ. P. 23(b)(2); (3) their interests are not in any way antagonistic to those of the other members of the Class; and (4) they are represented by counsel experienced in litigating DPPA cases and/or class actions.

164.    *Propriety of maintenance of class action under Fed. R. Civ. P. 23(b)(2).*  Class action status is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants acted and/or refused to act on grounds generally applicable to the Class, thereby making declaratory and/or injunctive relief, such as changing Mendota Heights' policies and/or

23

practices, training, or auditing/monitoring practices, or notification policies to either deter,

prevent, or more quickly identify Mendota Heights' personnel's unauthorized access to

Plaintiffs' and Class Members' Private Data, appropriate with respect to Plaintiffs and the

Class as a whole.

165.   *Propriety of maintenance of class action under Fed. R. Civ. P. 23(b)(3).*
Class action status is also appropriate under Fed. R. Civ. P. 23(b)(3).  The common

questions of law and fact identified above predominate over questions affecting only

individual members.  A class action is superior to other available methods for the fair and

efficient adjudication of this litigation, partly because only a class action could justify

the cost to try to prove the allegations in this Complaint.

166.   *Propriety of maintaining class action as to certain issues under Fed. R.*
*Civ. P. 23(c)(4).*   Alternatively, if the Court does not approve a class for both liability and

relief purposes  under Fed. R. Civ. P. 23(b)(2) and/or 23(b)(3), it should approve a class

to adjudicate some or all of the issues identified in this Complaint.

## LEGAL CLAIMS

### COUNT I – Violations of the Driver's Privacy Protection Act

### 18 U.S.C. § 2721, *et seq.*

(*Against Defendants Shepard and Mendota Heights*)

167.   Plaintiffs reaffirm and reallege the allegations in Paragraphs 1 through 166

as though fully set forth in this Paragraph 167.

168.   Plaintiffs and Class Members provided personal information to the DPS

including their addresses, Social Security Numbers, color photographs, dates of birth,

medial information, donor status, weights, heights, and eye colors for the purpose of acquiring and utilizing a State of Minnesota driver's license.

169.    The State Databases also maintained Plaintiffs' and Class Members' driving records.

170.    At no time did Plaintiffs or Class Members provide their consent for Shepard or Mendota Heights to obtain, disclose, or use Plaintiffs' and Class Members' Private Data for anything but official business.

171.    Intentionally obtaining, disclosing, or using driver's license information without an authorized purpose is a violation of the DPPA.  The statute provides for criminal fines and civil penalties.  18 U.S.C. §§ 2723, 2724.

172.    The DPPA creates an individual right to privacy in a person's driver's license information, thereby prohibiting unauthorized obtainment of all persons' information, including Plaintiffs' and Class Members' information.

173.    The DPPA provides redress for violations of a person's protected interest in the privacy of their motor vehicle records and the identifying information therein.

174.    The Defendants, each of them, have invaded Plaintiffs' and Class Members' legally protected interest under the DPPA.

175.    Defendants Shepard and Mendota Heights knowingly obtained, and upon information and belief, knowingly disclosed or used Plaintiffs' and the Class Members' Private Data from a motor vehicle record, for a purpose not permitted under the DPPA. 18 U.S.C. § 2724(a).

176. None of the Defendants' activities fell within the DPPA's permitted exceptions for procurement of Plaintiffs' or Class Members' private information.

177. Shepard and Mendota Heights knew that Shepard's actions related to the Plaintiffs' and the Class Members' personal information were in violation of the DPPA.

178. Mendota Heights knew or should have known or recklessly disregarded that Shepard was making these illegal accesses.

179. Mendota Heights knew that it did not ascertain what purpose Shepard had in accessing the Private Data.

180. By the actions described above, Shepard was acting within the course and scope of his employment when he obtained, disclosed, or used the Plaintiffs' and Class Members' Private Data from the State Databases for an impermissible purpose.

181. By the actions described above, Shepard was acting with apparent authority when he obtained, disclosed, or used the Plaintiffs' and Class Members' Private Data from the State Databases for an impermissible purpose.

182. By the actions described above, Shepard was aided-in-the-agency relationship when he obtained, disclosed, or used the Plaintiffs' and Class Members' Private Data from the State Databases for an impermissible purpose.

183. Shepard used Mendota Heights' computers, passwords, and passcodes to obtain the Plaintiffs' and Class Members' Private Data.

184. Mendota Heights is vicariously liable for Shepard's obtainments, disclosure, and use of Plaintiffs' and Class Members' Private Data for an impermissible purpose.

185.   By the actions described above, Mendota Heights is directly liable as a "person" as defined by the DPPA for its obtainments, disclosure, and use of Plaintiffs' and Class Members' Private Data for an impermissible purpose.

186.   Mendota Heights knowingly authorized, directed, ratified, approved, acquiesced in, committed, or participated in the obtainment, disclosure, or use of Plaintiffs' and Class Members' private personal information by Shepard.

187.   Mendota Heights is liable for the failure to train, monitor, and supervise Shepard, who was improperly and unlawfully obtaining the private drivers' license information of citizens, including Plaintiffs and Class Members, without a proper, lawful, permissible, or justifiable purpose for doing so.

188.   In other lawsuits and potential lawsuits, DPS audits have revealed that numerous officers in the Mendota Heights Police Department have made impermissible obtainments of the Databases.

189.   Upon information and belief, misuse of the State Databases has been well-known to municipalities like Mendota Heights.  At a hearing at which DPS Commissioner Mona Dohman testified, the testimony of the Legislative Auditor revealed that at least 50% of law-enforcement officers are misusing the DVS Database by accessing, disclosing, and/or using the drivers' license personal information for an impermissible purpose.

190.   The Legislative Auditor's Report showing such misuse is attached to this Complaint as Exhibit A.

191.    The Investigation showing such misuse by Mendota Heights and Shepard is attached to this Complaint as Exhibit B.

192.    Newspaper articles about such misuse by Mendota Heights and Shepard are attached to this Complaint as Exhibit C.

193.    Experts in the field of police training report that the primary complaint of many police departments is that law-enforcement personnel misuse private information. This is an established, well-known, and pervasive problem with law-enforcement that Mendota Heights has been unwilling to properly address.

194.    Mendota Heights had the ability to determine if unauthorized access was being made and to prevent such unauthorized access to the State Databases, including of Plaintiffs' and Class Members' private information, through inquiries and requests for audits from DPS.

195.    Mendota Heights failed to prevent unauthorized access to the State Databases, including of Plaintiffs' and Class Members' Private Data.

196.    Mendota Heights' own investigation and newspaper reports regarding the Investigation of Shepard's misconduct involving the State Databases makes apparent that Defendants' obtainment, disclosure, and use of the State Databases as to Plaintiffs' and Class Members' Private Data was not permissible.

197.    Upon information and belief, Defendants impermissibly obtained the Private Data of Plaintiffs and over dozens of Class Members, the exact number to be determined during discovery, as Mendota Heights limited its investigation of Shepard's misuse of the State Databases to only a few-month period.

28

198.    Plaintiffs and Class Members have suffered harm because their private information has been obtained unlawfully.  Plaintiffs and Class Members suffered and continue to suffer harm by virtue of the increased risk that their protected information is in the possession of Shepard, who obtained it without a legitimate purpose.  This is precisely the harm Congress sought to prevent by enacting the DPPA and its statutory remedies.

199.    Mendota Heights' investigation of Shepard states that he exposed Mendota Heights to potential liability of $2,500.00 per instance.

200.    As a direct and proximate result of Shepard's and Mendota Heights' acts and omissions, Plaintiffs and Class Members have been damaged in an amount yet to be determined, but believed to be well in excess of $100,000.00.

201.    Plaintiffs and Class Members are entitled to injunctive relief to prevent future impermissible obtainments, disclosures, and uses of their Private Data pursuant to 18 U.S.C. § 2724(b)(4).

202.    The Defendants each willfully and recklessly disregarded the law, entitling Plaintiffs and Class Members to punitive damages under the DPPA, see 18 U.S.C. § 2724(b)(2), which is not subject to the pleading requirement of Minnesota state law as set forth in Minn. Stat. § 549.20.  Plaintiffs and Class Members are entitled to actual damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and such other preliminary and equitable relief as the Court determines to be appropriate.  18 U.S.C. § 2724(b).

29

203.   In addition, under the DPPA, Plaintiffs and Class Members are each entitled to a baseline liquidated damages award of at least $2,500.00 for each violation of the DPPA.  18 U.S.C. § 2721(b)(1).  Plaintiffs and Class Members need not prove actual damages to receive said liquidated damages.

## COUNT II – Violations of Minnesota Government Data Practices Act (MGDPA), Minn. Stat. § 13.01, *et seq.*

### (*Against Defendant Mendota Heights*)

204.   Plaintiffs reaffirm and reallege the allegations in Paragraphs 1 through 203 as though fully set forth in this Paragraph 204.

205.   As stated earlier, the DPS, through its Driver and Vehicle Services Division ("DVS"), maintains motor-vehicle records regarding each of the named Plaintiffs and the Class Members in this lawsuit, which information is regularly accessible and accessed by Defendants for limited and defined permissible purposes.

206.   The motor-vehicle records maintained by DPS contain private and personal information, including the names, dates of birth, drivers' license numbers, addresses, Social Security numbers, drivers' license photos, weights, heights, and eye colors of Plaintiffs and the Class Members, as well as certain medical and disability information and donor information, referred to herein as "Private Data," all of which is protected against improper disclosure under the MGDPA, Minn. Stat. § 13.01, *et seq.*, § 168.346, and § 171.12, among others.

207.   Plaintiffs and the Class Members all provided the Private Data to DPS for the purposes of obtaining a Minnesota State driver's license or identification card.

208.    Upon information and belief, some of Plaintiffs and Class Members provided their Private Data to DPS to obtain other vehicle operations licenses, including but not limited to watercraft, snowmobile, commercial driver, and motorcycle licenses.

209.    Plaintiffs and the Class Members were required to provide the Private Data to DPS by law, and could not obtain a driver's license, identification card, or other vehicle operations license without providing their Private Data.

210.    Pursuant to both state and federal law, the Private Data is protected from unauthorized access, use, or disclosure, and the individuals providing the Private Data are assured that the Private Data will be safeguarded and will not be used for any unauthorized purpose by the state agency collecting it pursuant to state law.

211.    The Private Data is specifically protected by Minn. Stat. § 13.02, subds. 12-13; § 13.05, subds. 3-4; § 13.355; § 13.41; § 13.69, subd. 1; § 13.6905; § 84.0874; § 168.346; and § 171.12.

212.    Minn. Stat. § 13.02, subd. 12, specifically provides that Private Data is private and may only be disclosed as required or permitted by the federal DPPA.

213.    Minn. Stat. § 13.05, subd. 4, states that the Private Data "shall not be collected, stored, used, or disseminated by government entities for any purposes other than those stated to the individual at the time of collection in accordance with § 13.04…."

214.    The driver's license application Plaintiffs and Class Members are required to complete periodically assures Minnesota drivers that their information will be safeguarded and kept private.

31

215.    The State of Minnesota assures individuals submitting their Private Data that the State complies with state and federal law and that it protects this Private Data.

216.    Plaintiffs and Class Members provided this Private Data to DPS for the purpose of obtaining and maintaining licenses.

217.     The DPS system allows, or at a minimum formerly allowed, including during a portion of the time period relevant to this Complaint, for an employee (with the appropriate access) to utilize his or her login account and password to obtain private information on Minnesota residents from any computer at any time.

218.    The means of its employees accessing the State Databases are within the control of Mendota Heights.

219.    Defendant Mendota Heights obtained and provided account and password access to Shepard so that he could access the State Databases.

220.    Shepard acted within the course and scope of his employment in impermissibly accessing the Private Data, or in the alternative, acted within the course and scope of his authority, actual, implied, or apparent, in accessing the Private Data.

221.    Shepard was provided access to the Private Data by Mendota Heights through the issuance of a user account and password by the DPS and through the course, scope, and nature of his employment with Mendota Heights.

222.    Shepard's numerous intrusions into Plaintiffs' and Class Members' Private Data occurred and continued to occur due to the authority granted to him through his position with Mendota Heights.

223.   At no time did any of Plaintiffs and Class Members provide their express consent for anyone, including Shepard or Mendota Heights, to disclose or use their Private Data for any reason other than a legitimate law-enforcement purpose.

224.   Upon information and belief, Mendota Heights never sent any Plaintiff or Class Member a notice or letter advising them that their rights under the MGDPA and the DPPA have been violated by Shepard, though required to do so by the MGDPA.

**Mendota Heights Knew or Should Have Known of Shepard's Unauthorized Data Accesses and Did Nothing About It**

225.   Upon information and belief, Shepard knew and should have known that his obtaining, viewing, and accesses of Private Data were unauthorized.

226.   Mendota Heights knew or should have known about Shepard's unauthorized conduct.

227.   Upon information and belief, Shepard's unauthorized accesses of Private Data on a regular basis were widely known to many of the employees of Mendota Heights.

228.   Shepard's conduct in obtaining, disclosing, or using the Private Data was for purposes not permitted under the MGDPA, or under any state law, and was done in willful and reckless disregard of the rights of Plaintiffs and Class Members.

229.   Each unauthorized access of Plaintiffs' and Class Members' Private Data violated Plaintiffs' and Class Members' rights and constituted behavior prohibited by the MGDPA, as well as agency and departmental regulations.

230.   Mendota Heights' policies of security and enforcement were and are insufficient to protect the Private Data in the Minnesota State Databases.

231.   Such failed policies facilitated rampant unauthorized abuse and misuse of Private Data contained in Minnesota's State Databases, which amounted to numerous and gross intrusions into the privacy of Plaintiffs and other Minnesota citizens.

232.   Mendota Heights knew or should have known that such policies would allow for these intrusions.

233.   Mendota Heights has no viable method or has an inadequate method of ascertaining and controlling the unauthorized access of individuals' Private Data by its employees.

234.   Mendota Heights unlawfully disclosed Plaintiffs' and Class Members' Private Data by knowingly making that information available to Shepard without appropriate safeguards to ensure that Private Data could only be obtained for authorized purposes.

235.   Certainly there are procedures and methods which exist to prevent the unauthorized accessing of Minnesota residents' Private Data contained in the State Databases, however, Mendota Heights has taken insufficient steps and has expended insufficient effort to prevent such abuse.

236.   Mendota Heights is directly responsible for Shepard's unauthorized accesses of Plaintiffs' and Class Members' Private Data, as its wanton disregard in implementing appropriate safeguards, and its willfulness in permitting Shepard's actions, ultimately led to Shepard's widespread invasion of privacy.

34

237.    Plaintiffs and Class Members have been injured by Shepard's violations of state and federal law and intrusion on their privacy, have sustained actual damages as a result of these violations and invasion of privacy, and this invasion occurred as a result of the willful inaction of Mendota Heights.

238.    Shepard's willful access of Plaintiffs' and Class Members' Private Data violated the MGDPA.

239.    Shepard's access of Plaintiffs' and Class Members' Private Data was willful, and his willfulness is attributable to Mendota Heights.

240.    Shepard's conduct in obtaining, disclosing, and/or using Plaintiffs' and Class Members' Private Data was knowing and willful, and violated the MGDPA.

241.    Mendota Heights is directly and vicariously liable for the violations set forth above.

242.    Pursuant to Minn. Stat. § 13.08, subd. 1, a "responsible authority or government entity which violates any provision of this chapter is liable to a person or representative of a decedent who suffers any damage as a result of the violation…"

243.    The responsible authority related to Shephard's conduct is Defendant Mendota Heights.

244.    The responsible government entity related to Shephard's conduct here is Mendota Heights.

245.    Plaintiffs and Class Members have suffered actual damages, including but not limited to emotional distress, and upon information and belief, purchasing security

services, including but not limited to credit monitoring services, in response to Defendants' actions.

246.    Given that Shepard's use was known to be impermissible to him and to others, and given that the type of impermissible accessing of Private Data from the State Databases has been a rampant practice among law enforcement (which was or should have been known to Defendants), Plaintiffs and Class Members reserve the right to seek additional statutory damages as permitted by the MGDPA at a later date.

247.    In addition, Mendota Heights was required by law, including Minn. Stat. § 13.055, to notify the Plaintiffs and Class Members of these violations as they were the subjects of the data that was improperly acquired by Shepard; yet Mendota Heights failed to do so, which again is itself another violation of the MDGPA.

248.    Mendota Heights decision to disregard the MGDPA and fail to notify the Plaintiffs and Class Members of these illegal obtainments further concealed the illegal action from the Plaintiffs and Class Members.

249.    Plaintiffs and Class Members are entitled to compliance with the MGDPA's notice provisions, along with costs and reasonable attorneys' fees for compelling compliance, pursuant to Minn. Stat. § 13.08, subd. 4.

250.    Plaintiffs and Class Members are entitled to damages against Mendota Heights as a result of the violations of the MGDPA, pursuant to Minn. Stat. § 13.08, subd. 1.

251.    Because of willful violations of the MGDPA, Plaintiffs and Class Members are entitled to exemplary damages against Mendota Heights of not less than $1,000 and not more than $15,000 for each violation, pursuant to Minn. Stat. § 13.08, subd. 1.

252.    Plaintiffs and Class Members are entitled to recovery of their costs, including reasonable attorneys' fees, under Minn. Stat. § 13.08, subd. 1.

253.    Plaintiffs and Class Members are entitled to injunctive relief to prevent future impermissible obtainments, disclosures, and uses of their Private Data pursuant to Minn. Stat. § 13.08, subd. 2.

254.    Pursuant to Minn. Stat. 13.08, subd. 1, all Defendants have statutorily waived any immunity related to a cause of action under the MGDPA.

255.    The amount in controversy in this matter is far in excess of $75,000.

## JURY DEMAND

256.    Plaintiffs and Class Members demand a trial by jury as to all issues of fact herein properly triable before a jury under any statutory or common law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

1.  Certify the Class defined in paragraph 152 above, or such other class as discovery reveals to be appropriate;

2.  Declare Randolph Pentel, Kim Povolny, Michelle Povolny, and Michael Povolny, to be representatives of the Class;

3.  Declare undersigned counsel to be Class Counsel for the Class;

37

4.  Declare that the Defendants' conduct, as described in this Complaint, is unlawful;

5.  A money judgment against all the Defendants for liquidated, actual, and compensatory damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars and punitive damages in an amount to be determined by the jury, together with their costs, including reasonable attorneys' fees, under the DPPA, and other applicable laws, and prejudgment interest;

6.  Actual damages, punitive damages, attorneys' fees and other litigation costs, and such other preliminary and equitable relief as the Court determines to be appropriate under 18 U.S.C. § 2724(b);

7.  Liquidated damages of at least $2,500.00 for each violation of the DPPA under 18 U.S.C. § 2721(b)(1);

8.  Order Mendota Heights to adopt policies and practices designed to further deter and/or prevent Mendota Heights' personnel from unauthorized access to Plaintiffs', Class Members', and other citizens' Private Data;

9.  An injunction, permanently enjoining all Defendants from obtaining Plaintiffs' and Class Members' Private Data in violation of the DPPA, unless necessary for business related or authorized purposes under the law;

10. Damages against Mendota Heights under the MGDPA, Minn. Stat. § 13.08, subd. 1;

11. Costs and reasonable attorneys' fees against Mendota Heights under the MGDPA, Minn. Stat. § 13.08, subd. 1;

CASE 0:18-cv-01447-NEB-TNL   Document 1   Filed 05/25/18   Page 39 of 40

12. Exemplary Damages against Mendota Heights for willful violations of the MGDPA, Minn. Stat. § 13.08, subd. 1;

13. An injunction, permanently enjoining all Defendants from obtaining, disclosing, or using Plaintiffs' and Class Members' Private Data in violation of the MGDPA, unless necessary for business related or authorized purposes under the law, Minn. Stat. § 13.08, subd. 2;

14. Compliance with the MGDPA's notice provisions, along with costs and reasonable attorneys' fees for compelling compliance, pursuant to Minn. Stat. § 13.08, subd. 4; and

15. For such other and further relief as this Court deems just and equitable.

**SAPIENTIA LAW GROUP PLLC**

Dated:  May 25, 2018

s/Jonathan A. Strauss
Jonathan A. Strauss (#0279602)
Sonia Miller-Van Oort (#278087)
Robin M. Wolpert (#310219)
Lorenz F. Fett (#196769)
120 South Sixth Street, Suite 100
Minneapolis, MN  55402
Phone: (612) 756-7100
Fax: (612) 756-7101
jons@sapientialaw.com
soniamv@sapientialaw.com
robinw@sapientialaw.com
larryf@sapientialaw.com


and

**ENGELMEIER & UMANAH, PA**
Charles V. Firth (#0257825)
706 Second Avenue South, Suite 1100
Minneapolis, MN 55402
Phone: (612) 455-7720
Fax: (612) 455-7740
charlief@e-ulaw.com

**ATTORNEYS FOR PLAINTIFFS**