UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Randolph Pentel,<br>Kim Povolny,<br>Michelle Povolny, and<br>Michael Povolny,<br>*On Behalf of Themselves and All Others Similarly Situated*,<br><br>   Plaintiffs,<br><br>v.<br><br>Michael Shepard,<br>*in his individual capacity as an employee of the City of Mendota Heights*, and<br><br>City of Mendota Heights,<br><br>   Defendants. | Case No. 18-cv-1447 (NEB/TNL)<br><br><br><br><br><br><br><br>**ORDER** |

Charles V. Firth, Engelmeier & Umanah, PA, 706 Second Avenue South, Suite 1100, Minneapolis, MN 55402; and Jonathan A. Strauss, Lorenz F. Fett, Jr., Robin M. Wolpert, and Sonia L. Miller-Van Oort, Sapientia Law Group, 120 South Sixth Street, Suite 100, Minneapolis, MN 55402 (for Plaintiffs);

Elizabeth Peppin Ridley and Mark P. Hodkinson, Heley, Duncan & Melander, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437 (for Defendant Michael Shepard);

Jon K. Iverson, Stephanie A. Angolkar, and Susan M. Tindal, Iverson Reuvers Condon, 9321 Ensign Avenue South, Bloomington, MN 55438 (for Defendant City of Mendota Heights); and

Oliver J. Larson, Assistant Attorney General, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1800, St. Paul, MN 55101-2134 (for Respondent Minnesota Department of Public Safety).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Plaintiffs Randolph Pentel and Michael Povolny's[1] Motion to Compel Discovery (ECF No. 33). A hearing was held on June 19, 2019. (ECF No. 75.) Charles V. Firth appeared on behalf of Plaintiffs; Mark P. Hodkinson appeared on behalf of Defendant Michael Shepard; Stephanie A. Angolkar appeared on behalf of Defendant City of Mendota Heights ("the City"); and Oliver J. Larson appeared on behalf of Respondent Minnesota Department of Public Safety ("DPS").

## II. BACKGROUND

This is a putative class action for alleged violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, and the Minnesota Government Data Practices Act ("MGDPA"), Minn. Stat. § 13.01 *et seq.*, based on improper accesses of "private, personal and confidential drivers' license information" by Shepard, a police officer formerly employed by the City. (Compl. ¶¶ 1, 2, 35, ECF No. 1.)

### A. LEMS Database

In the performance of their duties, law enforcement officers have access to a number of different databases containing "license plate information and other private drivers' license information regarding Minnesota drivers," such as "names, dates of birth, driver's license numbers, addresses, driver's license photos, weights, heights, [and] various health and disability information." (Compl. ¶¶ 2, 24.) These databases "may be accessed and

---

[1] Plaintiffs Kim and Michelle Povolny have settled their claims. (*See, e.g.*, ECF Nos. 46-55.)

queried by different means, including entering a person's name, license plate number, or driver's license number." (Compl. ¶ 26; *see also* Compl. ¶ 25.)

One of these databases is the Law Enforcement Message Switch ("LEMS") database. The LEMS database is managed by the Minnesota Bureau of Criminal Apprehension ("BCA"), a division of DPS. (Decl. of Katherine A. Engler ¶ 4, ECF No. 65; DPS Opp'n at 2, ECF No. 63.) The LEMS database "was the original method of access" for this type of information "and was the only method of access for several decades." (Engler Decl. ¶ 4.) At the hearing, counsel for DPS stated that the LEMS database dates back to the 1980s. While there are other databases available, the "LEMS [database] is heavily used by law enforcement officers because it returns criminal history and other useful data that [other databases] do not." (Engler Decl. ¶ 5.)

### 1. Determining the Source of a LEMS Access

The "LEMS [database] is typically accessed through terminals in police stations and via devices in squad cars." (Engler Decl. ¶ 4.) Unlike other databases, use of the LEMS database is not tied to the identity of a particular user. Instead, use of the LEMS database is tied to the access device and the agency to which it is registered. When the LEMS database is accessed, the agency identifier, device identifier, date and time of the access, type of query, and information returned are logged. This means that audits for use of the LEMS database do not return information showing accesses by a particular law enforcement officer. Rather, audits show only that the information was accessed by a particular device registered to a particular agency. (*See* Engler Decl. ¶ 4; Aff. of Kelly McCarthy ¶ 7, ECF No. 58; Ex. 4 at 1 to Aff. of Jonathan A. Strauss, ECF No. 37-3.)

Accordingly, determining whether a specific law enforcement officer, i.e., Shepard, performed any one access of the LEMS database reflected in these audit returns is a multistep process. Because use of the LEMS database is not tied to the identity of a particular user, the City must undergo a series of crosschecks to determine whether Shepard was in fact the officer querying the LEMS database for each access. First, the City must contact its IT provider to determine which of its officers "was signed into the device at the time of the query." (McCarthy Aff. ¶ 7.) Second, the City "check[s] the schedule to make sure the officer signed in was working on the date and time of the query." (McCarthy Aff. ¶ 7.) Third, the City "check[s] squad assignment sheets to ensure the device was located in the squad the officer was assigned to." (McCarthy Aff. ¶ 7.) This process is complicated by the fact that "[d]evices can be moved between squads[ and], therefore, [the City] . . often ha[s] to find an additional verification source such as reports or citations written around the same time." (McCarthy Aff. ¶ 7.) For each access, the process can "take anywhere from a few minutes to an hour to verify this information." (McCarthy Aff. ¶ 7.)

2. **LEMS Audit Returns**

LEMS audit data is also less "user-friendly" than audit data from other databases. The "average LEMS audit return" for a single access/search is two to three pages, and the data returned is difficult to decipher. (Engler Decl. ¶ 8; *see* Pls.' Mem. in Supp. at 4-5, ECF No. 36; *see, e.g.*, Ex. 6 to Strauss Aff., ECF No. 39.)

In addition, some of the information in the LEMS database—for example, federal criminal history information—is protected from disclosure by federal law. (*See* Engler Decl. ¶¶ 5, 9; DPS Opp'n at 4.) *See, e.g.*, 28 C.F.R. § 20.33 (dissemination of criminal

4

history record information).² An excerpted LEMS audit return submitted to the Court states in no uncertain terms, and often multiple times per page, that "THIS RETURN IS OF FEDERAL DATA. THE FBI IMPOSES RESTRICTIONS ON THE RELEASE OF THIS DATA."³ (Ex. 6 *passim* to Strauss Aff.) This LEMS audit return also reflects that the "query [w]as . . . sent to . . . the FBI," (Ex. 6 at 11 to Strauss Aff.), and appears to show queries of the National Crime Information Center ("NCIC"), (Ex. 6 *passim* to Strauss Aff.).⁴

The NCIC is "the computerized information system, which includes telecommunications lines and any message switching facilities that are authorized by law, regulation, or policy approved by the Attorney General of the United States to link local, state, tribal, federal, foreign, and international criminal justice agencies for the purposes of exchanging NCIC related information." 28 C.F.R. § 20.3(n). "The NCIC includes, but is not limited to, information in the [Interstate Identification Index System]," *id.*, which is "the cooperative federal-state system for the exchange of criminal history records, and includes the National Identification Index, the National Fingerprint File, and to the extent of their participation in such system, the criminal history repositories of the states and the FBI," *id.* § 20.3(m). (*See* Law Enforcement's Use of State Databases at 5, Office of the Legislative Auditor, State of Minn., Ex. A to Compl., ECF No. 1-1 [hereinafter Legislative Auditor's Report] ("The Federal Bureau of Investigation provides BCA access to federal

---

² The citation to the federal regulation was provided to the Court at the hearing.
³ The excerpted LEMS audit return was filed under seal. The quotation of and reference to generalized information and terminology contained in the audit return goes only to the fact that federal information was queried and in no way speaks to the existence or absence of information responsive to the query.
⁴ *See supra* n.3.

databases; BCA in turn makes these available to law enforcement agencies."); *see also id.* at 4 (listing federal data sources, including the "Interstate Identification Index").)

Criminal history information maintained by the FBI is generally restricted to certain agencies and uses, and access to this information is subject to cancellation if "disseminat[ed] . . . outside the receiving departments, related agencies, or service providers." 28 C.F.R. § 20.33(a), (b), (d); *see id.* § 20.38 (sanction for noncompliance); *see also id.* § 20.30 (state criminal justice agencies subject to regulations governing federal systems and exchange of criminal history record information to the extent they use such systems). (*See also* Legislative Auditor's Report at 6 n. a ("The Federal Bureau of Investigation provides the [BCA] with access to federal databases and has created policies overseeing their access and use.").)

At the hearing, counsel for DPS explained that when LEMS data has been sought in the past, the BCA reviews the data and performs the necessary redactions. Counsel for DPS further explained that this is a labor-intensive process. The data is first assembled into a document, which then must be physically reviewed for protected information. (*See* Engler Decl. ¶ 9.) In a prior case DPS's counsel was involved in, it took weeks for the BCA to review and redact a LEMS audit return that was between 600 and 800 pages long.

**B. DPS Subpoena for LEMS Accesses**

In mid-January 2019,[5] Plaintiffs subpoenaed DPS for LEMS audit returns showing, in relevant part, individuals other than Plaintiffs that Shepard looked up by name or license

---

[5] At the hearing, Plaintiffs confirmed that a prior subpoena issued to DPS in September 2018 was not before the Court. (*See* Pls.' Mem. in Supp. at 4; Ex. 7 to Strauss Aff., ECF No. 37-5.)

plate number from May 25, 2014 to November 3, 2017.[6]  (Ex. 1 to Decl. of Oliver J. Larson, ECF No. 64 at 4-10.)  At the time Plaintiffs subpoenaed DPS, the City had agreed to assist Plaintiffs in sorting through the LEMS audit returns to determine which accesses were performed by Shepard.  (Ex. 11 at 1 to Strauss Aff., ECF No. 37-8.)

### 1. Burden to DPS/BCA

DPS objected[7] on grounds that the requested LEMS audit returns would be unduly burdensome because of the volume of responsive information and the amount of redaction required to remove "sensitive data" protected from disclosure under federal law.  (*See* Ex. 3 at 1 to Aff. of Susan M. Tindal, ECF No. 59-3; *see also* Ex. 13 to Strauss Aff., ECF No. 37-10; Engler Decl. ¶¶ 7-10.)  To estimate the volume of information responsive to Plaintiffs' subpoena, the BCA gathered LEMS audit returns for the City for one day.  (Engler Decl. ¶ 8.)  The audit returns for the sample day were approximately 200 pages long.  (Engler Decl. ¶ 8.)  Based on the BCA and counsel for DPS's experience, the sample audit returns were in line with expectations as "[a]n average LEMS audit return is 2-3 pages per search, and if the City . . . was running 70-100 searches a day, a number that seems reasonable, that would produce a volume of audit returns in the neighborhood of 211 pages." (Engler Decl. ¶ 8; *see* Ex. 12 to Strauss Aff., ECF No. 37-9.)

---

[6] The subpoena also sought the production of additional records.  The only issue before the Court is the LEMS audit returns showing individuals other than Plaintiffs that Shepard looked up by name or license plate number from May 25, 2014 to November 3, 2017.  At the hearing, in response to questioning from the Court, it appears that there may be a dispute as to whether all of the LEMS audit data for Plaintiffs has been provided.  Counsel for DPS represented that the LEMS audit data for Plaintiffs has been produced through January 31, 2018.  A portion of the LEMS audit data was first produced in response a MGDPA request and the remainder (encompassing the period of time after the prior request through the termination of Shepard's access to the databases) was produced on June 12, 2019.  Any dispute as to the completeness of Plaintiffs' LEMS audit data has not been briefed and is not before the Court.
[7] In their memorandum, Plaintiffs inadvertently stated that DPS did not timely object to the subpoena.  (*See, e.g.*, Pls.' Mem. in Supp. at 2, 13.)  Plaintiffs subsequently corrected the mistake by letter.  (ECF No. 62.)

7

Extrapolating the sample audit returns for a single day to the three-and-a-half-year period requested by Plaintiffs, the BCA estimated that Plaintiffs' subpoena would result in approximately 102,200 searches and 306,600 pages of LEMS audit returns, which would then have to be reviewed and redacted. (Engler Del. ¶ 9.) The BCA estimated that "it would take hundreds, if not thousands, of hours to redact the restricted federal criminal data from these returns." (Engler Decl. ¶ 9.) At the hearing, counsel for DPS also explained that the BCA had not attempted to retrieve this much LEMS audit data before and there were logistical concerns over assembling the sheer volume of audit returns in a useful way.

### 2. Burden to the City

After receiving the BCA's estimate about the volume of LEMS audit data potentially responsive to Plaintiffs' subpoena, the City withdrew its prior offer to sort through the LEMS audit returns to determine which accesses were performed by Shepard on grounds of undue burden. (Ex. 14 to Strauss Aff., ECF No. 37-11.) In light of the multistep process the City must undergo to determine whether any one particular access was performed by Shepard, the City estimates that "[e]ven if it took 2 minutes an access to determine whether Shepard made the access, it would take 20 months at 7 hours a day of uninterrupted work" to review the LEMS audit returns and "cost the City approximately $153,380 - $190,952." (McCarthy Aff. ¶ 7.) The City notes that, as part of an internal investigation, it took approximately 3 months to review the data associated with roughly 270 accesses. (McCarthy Aff. ¶¶ 1-2.)

## III. MOTION TO COMPEL

Plaintiffs seek to compel non-party DPS to provide the LEMS audit returns for an approximately three-and-a-half-year period to the City, to have the City then determine which accesses were made by Shepard, and then for the City to identify to Plaintiffs those accesses made by Shepard and the identity of the individuals accessed. Plaintiffs also request that the Court order the City to notify individuals who were the subjects of accesses included in a 2017 disciplinary action against Shepard under Minn. Stat. § 13.055, subd. 2(a).[8]

### A. Legal Standard

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "'The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.'" *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment). "[A] court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case." *Id.*

---

[8] The Court has treated Plaintiffs' motion as one to compel compliance with the subpoena issued to DPS and the notification requirements of Minn. Stat. § 13.055, subd. 2(a). In their supporting memorandum, Plaintiffs assert that the City has "not adequately respond[ed]" to an interrogatory and two requests for production of documents. (Pls.' Mem. in Supp. at 7.) These requests appear to seek the identification of individuals whose information was obtained by Shepard and for whom the City has determined the access was impermissible (and documents related thereto) as well as documents related to compliance with state notification laws. While Plaintiffs include the text of these discovery requests (Pls.' Mem. in Supp. at 6-7; Exs. 9, 10 to Strauss Aff., ECF Nos. 37-5, 37-6), they do not explain how the City's answers or responses were deficient. A motion to compel must contain "a concise statement of why the disclosure, answer, response, production, or objection is insufficient, evasive, incomplete, or otherwise improper." D. Minn. LR 37.1(d). Given that Plaintiffs have failed to explain how the City's answers or responses to these discovery requests were deficient, the Court has interpreted Plaintiffs' motion as seeking the LEMS audit returns as outlined herein and notification under Minn. Stat. § 13.055, subd. 2(a).

9

(quotation omitted). Considerations bearing on proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Vallejo*, 903 F.3d 742-43. This Court "has very wide discretion in handling pretrial discovery." *Hill v. Sw. Energy Co.*, 858 F.3d 481, 484 (8th Cir. 2017) (quotation omitted).

### B. LEMS Audit Returns

"At any time, on notice to the commanded person, the [party serving a subpoena] may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). "Subpoenas . . . are subject to the same constraints that apply to all of the other methods of formal discovery." *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL 7369890, at *3 (D. Minn. Feb. 13, 2017) (quotation omitted).

Rule 45 expressly requires a party to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). The Court "must enforce this duty." *Id.* As such, even relevant "discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999) (quotation omitted); *see* Fed. R. Civ. P. 26(b)(1); *see also Deluxe Fin. Servs.*, 2017 WL 7369890, at *4 ("These

considerations are echoed in the proportionality factors set forth in . . . Rule 26(b)(1).").
"[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *Miscellaneous Docket Matter No. 1*, 197 F.3d at 927 (quotation omitted). Accordingly, any order compelling compliance with a subpoena "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(B)(ii); *see* Fed. R. 45(d)(3)(A)(vi) (court must quash or modify a subpoena that subjects a person to undue burden). In the end, "it is the collective responsibility of the parties and the Court to consider the proportionality of all discovery," and the Court "must consider all of the information brought by the parties to reach a case-specific determination about the appropriate scope of the subpoena." *Deluxe Fin. Servs.*, 2017 WL 7369890, at *4; *see Vallejo*, 903 F.3d at 742.

Here, the LEMS audit returns Plaintiffs seek to compel would require an enormous amount resources to produce, creating a tremendous burden on both non-party DPS and the City. For DPS, there are questions of technical feasibility related to assembly and production as well as the substantial amount of time needed not only to amass the information but then physically to review and redact hundreds of thousands of pages of audit returns for more than three years. Then, for each of the thousands of accesses predicted, the City would need to perform a costly, time-consuming multistep process to determine whether the access was in fact made by Shepard.

Balanced against these heavy burdens is the highly speculative usefulness of this information to Plaintiffs' claims. Plaintiffs claim that the LEMS audit returns are "essential

11

to a determination if Shepard obtained the driver's license data of enough individuals for an impermissible reason to satisfy Rule 23(a)(1)'s numerosity requirement." (Pls.' Mem. in Supp. at 13-14.) But, even if the City and DPS perform all of the work requested, the end result would simply be raw access information. Plaintiffs would merely know that Shepard accessed an individual's information in the LEMS database at a particular point. The LEMS audit returns will not speak to the purpose for Shepard's access—permissible or otherwise.

As DPS points out, "[P]laintiffs must show more than just driver's license searches by . . . Shepard" to sustain a claim under the DPPA. (DPS Opp'n at 6 (citing *McDonough v. Anoka Cty.*, 799 F.3d 931, 948 (8th Cir. 2015); *Tichich v. City of Bloomington*, 835 F.3d 856, 866 (8th Cir. 2016)). Plaintiffs "must show that these searches were conducted without a lawful purpose." (DPS Opp'n at 6.) Thus, even if the Court were to grant Plaintiffs' motion, the LEMS audit returns requested "will shed little light on the question of how many people had their data *wrongfully* accessed by Shepard[]" because Plaintiffs will have difficulty differentiating wrongful accesses from lawful accesses. (DPS Opp'n at 6.) Again, the LEMS audit returns will merely reflect Shepard's accesses—both permissible and impermissible. In fact, Plaintiffs' counsel acknowledged as much prior to subpoenaing DPS. (Ex. 11 at 2 to Strauss Aff. (noting Plaintiffs would need to "[d]etermine which accesses by Shepard were not for a permissible purpose, possibly through further written discovery and depositions of your clients, to establish individual claims and meet Rule 23 requirements").

In the end, the LEMS audit returns themselves "will . . . be of little use to determine

12

the numerosity of [P]laintiffs' proposed class," *i.e.*, individuals whose data was accessed for an *impermissible* purpose. (DPS Opp'n at 6.) While "Plaintiffs are well-positioned to argue why Shepard's search of their own data was improper[, t]hey are not well-positioned to speculate as to why his search of other people['s] data may have been improper." (DPS Opp'n at 6.) Plaintiffs are essentially engaging in a costly fishing expedition, the fruits of which will require considerable extra time and expense to chase down Plaintiffs' suspicions. *See* Fed. R. Civ. P. 1, 26(b)(1).

Plaintiffs also assert that "[w]ithout the identities of these individuals, the federal rights of the class members would be lost." (Pls.' Mem. in Supp. at 14.) Plaintiffs do not explain this blanket assertion, but later state that the City is "running out the clock on those individuals." (Pls.' Mem. in Supp. at 16.) Plaintiffs cannot use personal information from state motor vehicle records to solicit participation in this lawsuit. *Maracich v. Spears*, 570 U.S. 48, 59-73 (2013). Individuals may request audits of accesses to their driver's license information if they themselves suspect or are concerned that their information may have been accessed for an impermissible purpose. (*See* Legislative Auditor's Report at 35-37 (discussing individual inquiries regarding access to driver's license information).) And, if Plaintiffs prevail on Count II of their Complaint, the City may well be required to inform individuals whose information was impermissibly accessed by Shepard of those accesses. *See infra* Section III.C. Further, individuals may also bring their own claims under the DPPA if they believe their information was accessed for an impermissible purpose. Plaintiffs have not persuasively articulated with any sort of specificity how the rights of other individuals rise and fall with the LEMS audit returns at issue.

Based on the foregoing, the Court concludes that the LEMS audit returns requested by Plaintiffs are not proportional to the needs of this case when taking into account the massive burden to non-party DPS and the City, the speculative probative value of the data in resolving the issues in this litigation, and the increased delay and expense that would result. These are the very types of considerations mandated by Rule 26(b)(1). Therefore, Plaintiffs' motion is denied with respect to the LEMS audit returns.

### C. Notification Under Minn. Stat. § 13.055, Subd. 2(a)

Lastly, pursuant to the Court's "inherent authority," (Pls.' Mem. in Supp. at 16), Plaintiffs request that the Court order the City to notify individuals who were the subjects of accesses included in a disciplinary action against Shepard under Minn. Stat. § 13.055, subd. 2(a). The City opposes Plaintiffs' request on grounds that § 13.055's notification requirement has not been triggered.

In 2017, Shepard received a suspension for, among other things, misuse of the databases. (*See generally* Ex. 1 to Strauss Aff., ECF No. 37-1.) The City's chief of police dismissed 6 of 18 "suspicious queries" by Shepard, and "[a]fter all efforts to validate his [remaining] queries, there [we]re still 12 queries of plates and two image queries which violate policy and law." (Ex. 1 at 5 to Strauss Aff.)

Section 13.055, subdivision 2(a), of the MGDPA provides that

> [a] government entity that collects, creates, receives, maintains, or disseminates private or confidential data on individuals must disclose any breach of the security of the data following discovery or notification of the breach. Written notification must be made to any individual who is the subject of the data and whose private or confidential data was, or is reasonably believed to have been, acquired by an unauthorized

14

> person and must inform the individual that a report will be prepared . . . , how the individual may obtain access to the report, and that the individual may request delivery of the report by mail or e-mail. The disclosure must be made in the most expedient time possible and without unreasonable delay, consistent with (1) the legitimate needs of a law enforcement agency as provided in subdivision 3; or (2) any measures necessary to determine the scope of the breach and restore the reasonable security of the data.

The MGPDA further provides that actions to compel compliance may be brought civilly or administratively. Minn. Stat. § 13.08, subd.4(a); *see generally* Minn. Stat. §§ 13.08 (civil remedies), 13.085 (administrative remedies).

Plaintiffs have brought one such civil action. As part of Count II, Plaintiffs allege that the City was responsible for Shepard's impermissible accesses and violated the MGDPA when it failed to notify those individuals Shepard impermissibly accessed in accordance with Minn. Stat. § 13.055. (Compl. ¶¶ 204-49.) In their prayer for relief, Plaintiffs specifically request that the City be directed to comply with the MGDPA's notice provisions, citing Minn. Stat. § 13.08, subd. 4.

Plaintiffs are essentially asking the undersigned to render a dispositive ruling. Plaintiffs are using a motion to compel to obtain the very relief prayed for in Count II. A motion to compel is a non-dispositive motion most often heard by a magistrate judge. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. LR 72.1(a)(2); *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, No. 14-cv-3103 (SRN/FLN), 2016 WL 4167954, at *4 (D. Minn. Aug. 4, 2016). Dispositive motions—motions that dispose of claims in a lawsuit, including motions for summary judgment or judgment on the pleadings—are most often heard by the presiding district judge. *See* 28 U.S.C. § 636(b)(1)(A); D. Minn. LR

72.1(a)(2). Other than an ambiguous and conclusory reference to the Court's "inherent authority," Plaintiffs put forth no legal authority to support the availability of such relief in connection with a motion to compel. This will not do. Therefore, Plaintiffs' request that the undersigned order notification under Minn. Stat. § 13.055, subd. 2(a), is denied.

### D. Attorney Fees & Costs

The Federal Rules of Civil Procedure provide that, when a motion to compel is denied, the Court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses occurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). "But the [C]ourt must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." *Id.* Here, the Court finds each party should bear their own attorney fees and expenses.

## IV. ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion to Compel Discovery (ECF No. 33) is **DENIED**.

2. Each party should bear their own attorney fees and expenses

3. All prior consistent orders remain in full force and effect.

4. Failure to comply with any provision of this Order or any other prior consistent Order shall subject the non-complying party, non-complying counsel and/or the party such counsel represents to any and all appropriate remedies, sanctions and the like, including without limitation: assessment of costs, fines and attorneys' fees and disbursements; waiver of rights to object; exclusion or limitation of witnesses, testimony, exhibits and other evidence; striking of pleadings; complete or partial dismissal with prejudice; entry of whole or partial default

judgment; and/or any other relief that this Court may from time to time deem appropriate.

Dated: August   7   , 2019         *s/ Tony N. Leung*
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*Pentel et al. v. Shepard et al.*
Case No. 18-cv-1447 (NEB/TNL)